UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHUBB SEGUROS PERU S.A. a/s/o Ingram
Micro SAC and Saint Gobain Peru, S.A.,
INGRAM MICRO SAC, SAINT GOBAIN
PERU, S.A., and INTCOMEX PERU SAC,

                 *Plaintiffs,*

      - against -

M/V AS FORTUNA, her engines, boilers, etc.,
AS FORTUNA OPCO B.V., JAS
FORWARDING SERVICES (IRELAND)
LIMITED d/b/a/ Blue World Line, SHIPCO
TRANSPORT INC., and ONBOARD
LOGISTICS USA INC.,

                 *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**20-cv-3392 (ALC)(DF)**

 

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT
ON THE PLEADINGS IN FAVOR OF DEFENDANT SHIPCO
TRANSPORT INC. AND/OR FOR SUMMARY JUDGMENT
AND/OR FOR PARTIAL SUMMARY JUDGMENT ON
DAMAGES PURSUANT TO FRCP RULE 12(c), RULE 19 AND RULE 56**

David T. Maloof, Esq.
Kipp C. Leland, Esq.
Maloof & Browne LLC
411 Theodore Fremd. Ave., Suite 190
Rye, New York 10580
Tel: (914) 921-1200
Fax: (914) 921-1023
Emails: dmaloof@maloofandbrowne.com
kleland@maloofandbrowne.com

*Attorneys for Defendant Shipco Transport, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. II

BACKGROUND .................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 1

ARGUMENT ....................................................................................................................... 6

   I.     STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(c) AND 56 ...................... 6

  II.    THERE IS NO CONTRACTUAL BASIS TO HOLD SHIPCO LIABLE FOR THE SALVAGE FUNDS PLAINTIFF ALLEGEDLY PAID. IN FACT THE APPLICABLE CONTRACT TERMS ARE CLEAR THAT SHIPCO IS TO BE HELD "HARMLESS" FROM ANY SUCH CLAIMS ................................................ 7

 III.   THERE IS NO BASIS TO HOLD SHIPCO LIABLE UNDER COMMON LAW MARITIME INDEMNITY, WHICH REQUIRES PLAINTIFF TO PROVE SHIPCO WAS AT FAULT, AS THERE IS NOT A SCINTILLA OF EVIDENCE HERE THAT SHIPCO HAD OR EVEN COULD HAVE HAD ANY FAULT ...... 12

 IV.   PLAINTIFF'S ALLEGATION THAT THE IMDG CODE WAS VIOLATED HAS NO BASIS WHATSOEVER IN FACT AND SHOULD BE DISMISSED ON SUMMARY JUDGMENT ...................................................................................... 15

  V.    THERE IS NO OTHER LEGALLY COGNIZABLE BASIS TO HOLD SHIPCO, AS AN NVOCC, LIABLE TO REIMBURSE ANY SALVAGE PAYMENTS ARISING OUT OF ANY ALLEGEDLY UNSEAWORTHY CONDITION OF THE VESSEL AS FORTUNA ................................................................................ 16

 VI.   THE VESSEL OWNER IS AN INDISPENSIBLE PARTY AND SINCE IT HAS NOT YET BEEN, AND CAN NOT BE, FULLY JOINED IN THIS ACTION, DISMISSAL IS REQUIRED..................................................................................... 20

 VII.  THERE IS NO VALID CLAIM AGAINST DEFENDANT SHIPCO UNDER U.S. COGSA ................................................................................................................ 25

VIII.  UNDER THE SHIPCO BILL OF LADING TERMS AND CONDITIONS, SHIPCO IS ALSO ENTITLED TO BENEFIT FROM THE INJUNCTION ISSUED IN THE VESSEL OWNER'S LIMITATION OF LIABILITY PROCEEDINGS, WHICH IN TURN DIRECTLY BAR THIS COMPLAINT ....... 27

 IX.   IN ANY EVENT, SHIPCO'S MAXIMUM LIABILTY IS LIMITED BY CONTRACTUAL AGREEMENT TO $500............................................................ 29

CONCLUSION.................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*All Commodities Supplies, Ltd. v. M/V Acritas*, 1981 WL 6769684
    (E.D. La. May 18, 1981) ................................................................. 19

*Am. Petroleum & Transp., Inc. v. City of New York,*
    902 F. Supp. 2d 466 (S.D.N.Y. Oct 10, 2012) .......................... 26

*Amerada Hess Oil & Chemical Div. v. S/T Mobil Apex,*
    602 F.2d 1095 (1979) ................................................................. 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................... passim

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................ 6, 18

*Bubble Up Int'l Ltd. v. Transpacific Carriers Corp.,*
    458 F. Supp. 1100 (S.D.N.Y. 1978) ......................................... 8, 26

*Chadwick v. Arabian American Oil Company,*
    656 F. Supp. 857 (D.Del. 1987) ............................................... 22

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ............................... 20

*Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70 (2d Cir. 1984) ............ 22

*G & G Steel, Inc. v. Sea Wolf Marine Transp., LLC,*
    380 Fed. Appx. 103 (2d Cir. 2010) ........................................... 26

*Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010) .......................... 6

*Hellenic Lines, Ltd. v. Embassy of Pakistan,*
    467 F.2d 1150 (2d Cir. 1972) .................................................... 25, 26

*In Re M/V MSC Flaminia*, 339 F.Supp. 3d 185 (S.D.N.Y. 2018) ............ 15

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
    *Sales Practices, & Prod. Liab. Litig.*, 826 F. Supp. 2d 1180 (C.D. Cal. 2011) ......... 22

*ING Bank N.V. v. M/V TEMARA, IMO No. 9333929,*
    892 F.3d 511 (2d Cir. 2018) ..................................................... 7

*Ins. Co. of N. Am. v. S/S Am. Argosy*, 732 F.2d 299 (2d Cir. 1984) ......... 18, 19

*Int'l Fire & Marine Ins. Co. v. Silver Star Shipping Am., Inc.,*
    951 F. Supp. 913 (C.D. Cal. 1997) ........................................... 17

*Jaffer v. Hirji*, 887 F.3d 111 (2d Cir. 2018) ................................... 7

*Metalimport of Romania v. S. S. Italia*, 426 F. Supp. 770 (S.D.N.Y. 1976) ................................ 19

*Oparaji v. Atl. Container Line*, No. 07 CIV 2124 (GEL), 2008 WL 4054412
  (S.D.N.Y. Aug. 28, 2008) ................................................................................................ 19

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ....................................................................... 23

*Republic of the Philippines v. Pimentel*, 553 U.S. 851 (2008) ..................................................... 29

*Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1927) ..................................................... 26

*Starr Indemnity & Liability Co. v. Transfair North America International Freight Services*,
  No. C17-697 RAJ, 2018 WL 4002541 (W.D. Wash. August 22, 2018) .......................... passim

*Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*,
  137 F.3d 94 (2d Cir. 1998) .............................................................................................. 25

*United States v. Hellenic Lines Ltd.*, 1981 WL 6769694 (S.D.N.Y. Nov. 20, 1981) ................. 19

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015) ........................................ 6

*Whyham v. Piper Aircraft Corporation*, 96 F.R.D. 557 (M.D. Penn. 1982) ............................... 23

*Yang Ming Marine Transp. Corp. v. Oceanbridge Shipping Int'l, Inc.*,
  48 F. Supp. 2d 1049 (C.D. Cal. 1999) ............................................................................ 17

## Statutes & Regulations

46 CFR § 515.2 ............................................................................................................................ 3

Carriage of Goods by Sea Act ("COGSA"), 49 Stat. 1207 (1936) ...................................... passim

## Rules

Fed. R. Civ. P. 12 .................................................................................................................... 1, 6

Fed. R. Civ. P. 19 ................................................................................................................. passim

Fed. R. Civ. P. 4 ........................................................................................................................ 20

Fed. R. Civ. P. 56 ................................................................................................................ 1, 6, 7

*Robins Dry Dock* Rule ............................................................................................................... 26

## Treatises

Buglass, *Marine Insurance and General Average in the United States:*
*An Average Adjuster's Viewpoint* (3d ed. 1991) .................................................. 10, 17

Schoenbaum, *Admiralty & Mar. Law* (6th ed.) .................................................. passim

Wilson & Cooke, *Lowndes and Rudolph, The Law of General Average*
*and the York-Antwerp Rules* (1997) ............................................................. 9

Wright & Miller, *Fed. Prac. & Proc. Civ.* (3d ed.). .................................................. 21

## Other Authorities

BIMCO New Jason Clause .................................................................................. 9

International Marine Dangerous Goods Code ("IMDG Code") .................................... 4, 7, 15, 16

Kehagiaras, *Duty Call: Do Nvoccs Have A Duty to Exercise Due Diligence*
*to Make A Ship Seaworthy?*, 27 U.S.F. Mar. L.J. 37 (2015) .................................... 17

York-Antwerp Rules of 1974 .............................................................................. 9, 10, 12

## BACKGROUND

Defendant Shipco Transport, Inc. ("Shipco"), by its counsel Maloof & Browne LLC, respectfully submits this memorandum in support of its entitlement to (a) judgment of dismissal on the pleadings[1] pursuant to Fed. R. Civ. P. 12(c), (b) dismissal on summary judgment pursuant to Fed. R. Civ. P. 56, (c) dismissal for failure to join an indispensable party under Fed. R. Civ. P. 19 and/or (d) partial summary judgment limiting its liability to no more than $500.

## STATEMENT OF FACTS

This case involves an alleged claim against Shipco for the reimbursement of at most $30,772.91[2] in salvage expenses alleged to have been incurred by the Plaintiffs, who are cargo owners and/or insurers of cargo aboard the vessel M/V AS Fortuna (hereinafter "Vessel"), a vessel alleged to have lost its engine power and ran aground off the coast of Ecuador on or about September 13, 2018 (the "Grounding Incident"). D.E. 22, p. 5, ¶ 17 and Sched. C, p. 14-15.

The only Plaintiff in this action who is claiming against Shipco is Intcomex Peru S.A. (hereinafter "Intcomex" or "Plaintiff"). D.E. 22, Sched. C, p. 14-15. The cargo of computer parts which Intcomex allegedly owned, and for which it is claiming (hereinafter referred to as "Cargo"), suffered no physical damage. *Id*; Leland Dec. Exh. 1, p. 4 (Plaintiff's Response to Interrogatory No. 2); Danes Dec. Exh. A (identifying cargo). The only damages which Intcomex has pled against Shipco is what Intcomex' insurer paid to an independent salvor, T&T Salvage

---

[1] Plaintiff's counsel has also filed a separate action against Shipco in the case of *Mapfre Peru, et. al. v. M/V AS Fortuna, et. al.,* USDC-SDNY Index No. 20-Civ. 5606 (the "Mapfre action"), arising out of this same voyage, which for reasons unclear to Shipco, Plaintiff has declined to date to consolidate with this action. *See*, D.E. 48, p. 2 (letter to Magistrate Judge Freeman). The claim against Shipco in the *Mapfre* action amounts to $9,748.61 and other than involving a different consignment of cargo, involves the same basic facts, contract terms and legal issues. Co-defendant JAS Forwarding Services (Ireland) Ltd ("JAS") is anticipated to file its own motion adopting much of the argument herein, as the claims against JAS, and indeed all of the other NVOCC defendants in this case (and in the *Mapfre* action) involve similar contracts and the same basic facts and legal issues.

[2] Shipco booked just a single 40-foot container (taking up 2 twenty-foot equivalent units or "TEUs") to be carried on the Vessel, which has a carrying capacity of 1345 TEUs.

LLC, which allegedly recovered the undamaged cargo from the vessel after the alleged grounding.[3] *Id.*; Leland Dec. ¶9 and Exh. 9 (salvage contract and settlement). Significantly, Plaintiff's complaint does not plead a claim for cargo damage under the Carriage of Goods by Sea Act ("COGSA"), nor does it even mention COGSA. D.E. 22.

The nominal Plaintiff claiming against Shipco here, Intcomex, has been admitted to not be the real party in interest on the claim, as the Cargo was insured by XL Catlin Insurance SE (hereinafter XL[4]), who is suing in the name of its insured, Intcomex. Leland Dec. Exh. 2, p. 9 (Plaintiff's answer to Shipco's Request for Admission ("RFA Answer") Nos. 19-23, admitting XL is the real party in interest).[5] Oddly, XL was originally a named plaintiff in this action, but Plaintiff's attorneys amended their complaint to remove XL as a party. D.E. 1, p. 1 (listing XL as a plaintiff); D.E. 22, p. 1 (XL no longer a party); RFA Answer Nos. 16-23 (Plaintiff's counsel admitting to removal of XL).

The owner of the Vessel is AS Fortuna Opco B.V. (hereinafter "Vessel Owner"), a defendant in this action. D.E. 22, ¶8. At no time did Shipco own the Vessel. Danes Dec. ¶3, 10

---

[3] In the maritime industry, salvage companies will typically respond to a vessel casualty and endeavor to save the vessel and its cargo, and bring the vessel and cargo to a place of safety, and to the extent the salvor saves the ship and the cargo, the salvor will receive a "salvage award" which represents a proportion of the value of the property saved, with the amount of compensation to be set based on various factors including the effort, risk and cost undertaken by the salvor to recover the property. *See, generally*, Schoenbaum, Admiralty & Mar. Law § 16:1 (6th ed.) (describing the law of salvage). NVOCCs are not party to those agreements and have no obligations under them. Danes Dec. ¶ 14.

[4] XL has in fact identified itself in the various documents as acting under at least four different variations of the same general company name, including, "XL Catlin Services SE" (Leland Dec. Exh. 2, p. 8-9, RFA Answer Nos. 16-23, admitting to insuring the Cargo; Leland Dec. Exh. 13, p. 2, email paying salvage, represented to be "operating within AXA Group's AXA XL Division") and "XL Insurance Company SE" (Leland Dec. Exh. 14, signing the General Average Bond) and "AXA XL, a division of AXA" (Leland Dec. Exh. 13, p. 1, email paying salvage) and "XL Catlin" (Leland Dec. Exh. 14, signing General Average Bond). All of these variations of XL will be referred to collectively herein as "XL" unless otherwise specifically identified.

[5] Shipco served two Requests for Admission upon Plaintiff in this action, which were responded to and upon which Plaintiff will be relying to support this motion. Plaintiff's response to Shipco's RFA Nos. 1-30 are appended as Exhibit 2 to the Leland Declaration. Plaintiff's response to Shipco's RFA Nos. 31-44 are appended as Exhibit 3 to the Leland Declaration. Shipco will cite to Plaintiff's admissions pursuant to these two RFAs in this Memorandum as "RFA Answer No. [ ]."

and 11; RFA Answer No. 1. Shipco is a Non-Vessel Operating Common Carrier ("NVOCC") pursuant to 46 CFR § 515.2(m)(2) and is registered as a NVOCC with the Federal Maritime Commission, under License No. 8352. Danes Dec. ¶2.

Shipco, as an NVOCC, issued a bill of lading to the shipper, nonparty Dachser USA Air & Sea Logistics Inc. ("Dachser"), which is identified as Shipco Bill of Lading No. CAO10452517 (hereinafter "Shipco Bill of Lading"), covering transportation of the Cargo from Miami, Florida to Callao, Ecuador. Danes Dec. ¶4 and Exh. A (Shipco Bill of Lading). Dascher is a company who the cargo owner, Intcomex, hired to arrange for transportation of the cargo. Leland Dec. ¶10 and Exh. 10. The Shipco Bill of Lading terms and conditions, which govern with respect to Shipco's role in the transportation of the Cargo (hereinafter "Shipco Bill of Lading Terms"), are set forth in the document M&B Doc. 12-23, a true copy of which is appended as Exhibit B to the Danes Declaration, and which Plaintiff admitted to in Footnote 1 of RFA Answer No. 31 (amending its response to RFA Answer No. 6 to admit the terms cover the Cargo).

As the face of the Shipco Bill of Lading indicates (in the box identifying the "Vessel"), Shipco had an understanding that the Cargo would ultimately be transported aboard the vessel "AS Faustina 16." Danes Dec., ¶6 and Exh. A. Shipco booked the Cargo (along with numerous other cargoes in a 40-foot shipping container) with nonparty Seaboard Marine (hereinafter "Seaboard"), another ocean carrier, for transportation from Miami, Florida to Callao, Ecuador. Danes Dec. ¶4 and 6.[6]

---

[6]Seaboard, in turn, arranged for a different vessel (the "Vessel" already identified as the M/V AS Fortuna) to transport the Cargo from Miami, Florida to Callao, Ecuador. Danes Dec. ¶7. Pursuant to this arrangement, Seaboard, as ocean carrier, issued a bill of lading to Shipco, under which Shipco is the Shipper, and is identified as Seaboard Bill of Lading No. SMLU5384387A ("Seaboard Bill of Lading"). Danes Dec. ¶9 and Exh. C. Seaboard's bill of lading terms and conditions, applicable to the service it provided for the Cargo, are attached to the Declaration of Ingrid Velez, Insurance and Claims Director of Seaboard. Velez Dec. ¶4 and attachment. Seaboard was entitled to substitute the M/V AS Fortuna for the M/V AS Faustina 16 (or any other vessel), under ¶12 of its bill of lading terms, which are identified as "METHODS AND ROUTES OF TRANSPORTATION". Velez Dec. Attachment, p. 9-10 of 18. Such a clause is common in the maritime industry. Danes Dec. ¶8.

Shipco was a shipper in its relationship to Seaboard, and at no time did Shipco have any control over any aspect of the condition or operation of the Vessel, its maintenance, its crewing and/or crew training, or the physical condition and maintenance of its mechanical and navigation systems, or any of the Vessel's documents pertaining to these items. Danes Dec. ¶¶10-11. Seaboard likewise had no control over any aspect of the condition or operation of the Vessel, its maintenance, its crewing and/or crew training, or the physical condition and maintenance of its mechanical and navigation systems, or any of the Vessel's documents pertaining to these items. Velez Dec. ¶¶8-10. It would be impossible for Shipco, one step further removed from the Vessel Owner than Seaboard was, to have any input in to the operation, maintenance, crewing, training or physical condition of the Vessel. Danes Dec. ¶¶9-11. The Complaint does not plead any facts specific to any fault on the part of Shipco whatsoever, other than alleging, without any specificity, that the specific vessel the Cargo was loaded on (which Shipco did not even select or know of), was unseaworthy. D.E. 22.[7]

This case involves a routine engine breakdown. There are utterly no facts which would substantiate any violation by Shipco of the International Marine Dangerous Goods Code ("IMDG Code"), which generally comes into play in covering ship fires, other than a bare mention of this code, without alleging any facts pertaining to any violation of it or how it caused any casualty here, in the Complaint. D.E. 22, ¶41-42, p. 9. Plaintiff has neither produced nor identified any documents supporting this allegation in its Rule 26 Disclosures. Leland Dec. Exh. 5 (no such documents identified and no witnesses disclosed in Plaintiff's Rule 26 Disclosures).

---

[7] The state of disclosure here is as flawed as the pleadings. Plaintiff has in fact failed to produce even one document in its Initial Disclosures or otherwise to support any fault on the part of Shipco with respect to the alleged grounding. Leland Dec., Exh. 4, (Plaintiff's answer to Shipco's Request for Production No. 6, p. 6) (Plaintiff failed to produce any documents substantiating the allegation). Plaintiff has also failed to identify even one witness to support any fault on the part of Shipco with respect to the alleged grounding. Leland Dec., Exh. 5 (Plaintiff's Initial Disclosures, disclosing no witnesses).

The Vessel Owner has filed for Limitation of Liability in connection with the voyage at issue in Singapore (hereinafter "Singapore Limitation Proceeding"). RFA Answer Nos. 1-2, 4-5, and 40-41; Declaration of Joseph Tan, ¶3 and Exh. B. The courts of Singapore issued an injunction against cargo claimants filing actions going beyond merely establishing liability against the Vessel Owner in connection with the alleged grounding (hereinafter "Singapore Injunction"). RFA Answer No. 3 and Tan Dec. ¶7 and 10-13 and Exh. C, p. 2, Section 4 (true copy of Singapore Injunction). An affiliate of XL, "AXA XL Insurance Co." (hereinafter referred to as "AXA XL") in fact filed a claim in the Singapore Limitation Proceeding for "mining equipment" and thus is fully aware of this Injunction and in fact a party to the lawsuit from which the Injunction originates. Tan Dec. ¶¶17-18 and Exh. G-H.

Though XL could have filed a claim in the Singapore Limitation Proceeding for the Cargo owned by Intcomex which is the subject of the action in this court, XL apparently did not. RFA Answer Nos. 38-39 (XL admits that it did not claim for this cargo in Singapore). The Singapore Injunction does not preclude XL from filing suit against the Vessel Owner here, provided that such a suit only seeks a determination as to whether the Vessel Owner is liable for the grounding. Tan Dec. ¶¶10-11. Plaintiff is however enjoined from seeking damages from the Vessel Owner in other courts, and is required to only seek damages from the Vessel Owner in the Singapore Limitation Proceeding. Tan Dec. ¶¶10-11. Plaintiff's Amended Verified Complaint in this action exceeds that which is permitted under the Injunction, because Plaintiff seeks an award of actual money damages from the Vessel Owner. D.E. 22, p. 10-11 ("Wherefore" clause of complaint asking for money judgment against, *inter alia*, Vessel Owner). XL and Intcomex also filed suit against the Vessel Owner in the Netherlands with respect to this casualty. RFA Answer Nos. 26-29. The court in Singapore found that none of the parties who filed claims in the Singapore

Limitation Proceeding contested the Vessel Owner's entitlement to limit its liability to the amount of the security that it posted with the court in Singapore.  Tan Dec. ¶¶14-15 and Exh. D, p. 1.

**ARGUMENT**

**POINT I**

**STANDARD OF REVIEW**
**UNDER FED. R. CIV. P. 12(c) AND 56**

Federal Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).[8] In deciding a motion for judgment on the pleadings, a district court must "employ the same standard applicable to Rule 12(b)(6) motions to dismiss", accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the nonmoving party's favor. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015). Therefore, to survive a motion pursuant to Rule 12(c), a complaint or counterclaim must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  Under Rule 12(b)(6), a complaint must allege facts that are "enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id*.  The complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556).

Summary judgment pursuant to Fed. R. Civ. P. 56 is proper "if the movant shows

---

[8] Pursuant to the text of F.R.C.P. 12(b)(2)(c), a motion for dismissal on the pleadings due to failure to name an indispensable party as per F.R.C.P. 19 can be made even after the pleadings are closed.

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir.

2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018).[9]

## POINT II

### THERE IS NO CONTRACTUAL BASIS
### TO HOLD SHIPCO LIABLE FOR THE SALVAGE
### FUNDS PLAINTIFF ALLEGEDLY PAID. IN FACT
### THE APPLICABLE CONTRACT TERMS ARE CLEAR THAT
### SHIPCO IS TO BE HELD "HARMLESS" FROM ANY SUCH CLAIMS

Though it does not appear that Plaintiff in fact pled a contract cause of action in the

Amended Verified Complaint (D.E. 22),[10] case law is clear that the only valid basis for Plaintiff

to recover from Shipco is pursuant to a contractual agreement, and thus this issue will be addressed

first in the event the Court construes the pleadings to include a contract cause of action.

Specifically, in the *Starr Indemnity* case, which is directly on point, the court found that the only

basis for a NVOCC to be liable to a shipper, where there is no cargo damage, and the only claim

is for casualty-related expenses such as salvage, would be pursuant to contract, under "the express

language of the bills of lading." *Starr Indemnity & Liability Co. v. Transfair North America*

---

[9] We trust that the Court is familiar with the balance of the standards with respect to summary judgment, and thus to save on space, we will not repeat them here. We will of course provide them at the Court's request.

[10] Plaintiff's Amended Verified Complaint pleads three causes of action, none of which appear to be premised upon contractual liability. D.E. 22. Since the case law (cited in this Point) makes clear that contract liability is the only basis under which Plaintiff can recover, Shipco first addresses the lack of any contract claim. Turning to the causes of action which were pled, the First Cause of Action Plaintiff's Amended Verified Complaint appears to be based upon a claim for indemnity, on the basis of alleged negligence, and thus appears to seek recovery based on common law indemnity. *Id*. at p. 6-7. The Second Cause of Action appears to, again, be based upon a claim for indemnity, on the basis that Shipco is a "common carrier" and thus again appears to seek recovery based on common law indemnity and not a specific contractual obligation. *Id*. at p. 7-8. The Third Cause of Action appears to be based on a claim for indemnity under the general maritime law and the IMDG Code, and thus, once again appears to seek recovery on the basis of common law indemnity and not a specific contractual obligation. *Id*. at p. 8-10. Point III of this memorandum of law makes clear that there is no factual or legal basis for Shipco to be liable under common law indemnity and the general maritime law. Point IV of this memorandum makes clear that the IMDG Code has no application here at all. Point V of this memorandum makes clear that there is no legal or factual basis for Plaintiff to recover in indemnity on the basis of the allegation that Shipco is a "carrier."

*International Freight Services*, No. C17-697 RAJ, 2018 WL 4002541, at *5-6 (W.D. Wash. August 22, 2018). Accordingly, the Shipco Bill of Lading terms here are the only basis under which Plaintiff could even potentially recover from Shipco the salvage it paid. A review of the Shipco Bill of Lading Terms reveals that there in fact is no contractual agreement for Shipco to repay any salvage expense. Danes Dec. Exh. B (Shipco Bill of Lading Terms).

A cargo owner can only seek reimbursement of the sums that it has paid in salvage as an "indemnity" claim. *Bubble Up Int'l Ltd. v. Transpacific Carriers Corp.,* 458 F. Supp. 1100, 1104, Fn. 4 (S.D.N.Y. 1978) (actions to recover salvage are construed as actions for indemnity). Thus, since the claim that Plaintiff is asserting against Shipco has to be an indemnity claim to make Shipco reimburse Plaintiff for what Plaintiff paid to the salvor to recover the cargo from the vessel after it went aground, it is important to recognize that an indemnity obligation in a maritime contract "should be clear and distinct." Schoenbaum, Admiralty & Mar. Law § 5:16 (6th ed.) (construing requirements for indemnity clauses in maritime contracts).[11] There is no language in the Shipco Bill of Lading terms which comes anywhere close to a clear and distinct agreement for Shipco to indemnify Intcomex (or its insurer) for salvage it paid with respect to the Cargo. Danes Dec. Exh. B. Although no general average adjustment was prepared for this casualty, that does not change the fact that salvage claims are understood in the industry to be claims of a general average nature. The terms and conditions of the Shipco Bill of Lading also specifically state that General Average[12] is likewise entirely for the Merchant's account, i.e. to be paid by Plaintiff and

---

[11] Thomas J. Schoenbaum's treatise on U.S. maritime law, cited throughout this memorandum of law, is available on Westlaw.

[12] Under an ancient (and some assert long outdated) maritime doctrine known as "General Average," cargo owners are sometimes required to contribute to the vessel owner pro rata (based upon the value of each cargo and the vessel) for expenses the vessel owner incurs in connection with a maritime casualty. *See, generally*, Schoenbaum, Admiralty & Maritime Law §17.1.

not by Shipco.

Bills of lading typically set the contractual standards upon which such reimbursement/indemnity claims can be granted through what has become known as "The New Jason Clause" or the "Amended Jason Clause."  The Shipco Bill of Lading, Danes Dec. Exh. B (at Clause 18(1)), incorporates by reference what is more specifically known here as the "BIMCO New Jason Clause," which is published on BIMCO's[13] website, and which reads in pertinent part as follows:

> In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

BIMCO, *New Jason Clause*, copy appended to Leland Dec. Exh. 17.

Here, however, as discussed, that New Jason Clause is significantly modified in the Shipco Bill of Lading, at Clause 18(2), which in fact contractually obligates the Merchant, i.e. Plaintiff, to hold the Carrier, i.e. Shipco, harmless from "any claim of a general average nature" in the industry includes any salvage claims[14] per the clause below:

---

[13] BIMCO stands for "Baltic and International Maritime Council" and describes itself as "the world's largest direct-membership organisation for shipowners, charterers, shipbrokers and agents. In total, around 60% of the world's merchant fleet is a BIMCO member, measured by tonnage (weight of the unloaded ships).  The organisation has NGO status and is based in Copenhagen, Denmark, with offices in Athens, Singapore and Shanghai." https://www.bimco.org/

[14] The Shipco Bill of Lading incorporates into itself by reference a set of rules governing General Average called the "York-Antwerp Rules of 1974" (hereinafter "York-Antwerp Rules").  Danes Dec. Exh. B, at Clause 18(1).  The York-Antwerp Rules are "a standard code of practice" to govern General Average.  Schoenbaum, Admiralty and Maritime Law, § 17.2. Rule IV of the York-Antwerp Rules specify that General Average charges include salvage charges. York-Antwerp Rules, Rule VI.  Leland Dec. ¶8 and Exh. 8, p. 3.  Indeed, in his treatise, Schoenbaum confirms unambiguously that salvage is one of the expenses that are traditionally of a General Average nature. *See also* Schoenbaum, §17.1 (listing "salvage expenses" as included in General Average).  *See also,* Wilson & Cooke, *Lowndes and Rudolph, The Law of General Average and the York-Antwerp Rules*, §6.17 – 6.34 (1997) (Leland Dec. Exh. 18, chapter on "Salvage Remuneration"); Leslie J. Buglass, *Marine Insurance and General Average*

**18) GENERAL AVERAGE**

1. The Carrier may declare General Average which shall be adjustable according to the York/Antwerp Rules of 1974 at any place at the option of the Carrier and the Amended Jason Clause as approved by BIMCO is to be considered as incorporated herein and the Merchant shall provide such security as may be required by the Carrier in this connection.

**2. Notwithstanding (1) above, the Merchant shall defend, indemnify and hold harmless the Carrier in respect of any claim (and any expense arising therefrom) of a General Average nature** which may be made on the Carrier and shall provide such security as may be required by the Carrier in this connection.[15]

3. The Carrier shall be under no obligation to take any steps whatsoever to collect security for General Average contributions due to the Merchant.

Danes Dec. Exh.B, p. M&B Doc. 021, Clause 18 (emphasis added).

Indeed, the Shipco Bill of Lading also contains several other clauses which clearly and distinctly state the opposite of Plaintiff's position – that Plaintiff is not entitled to repayment of any salvage from the "Carrier", i.e. Shipco.[16]   The first such clause states:

7) Carrier's Responsibility

The Carrier shall not be responsible for any loss to the Goods however caused occurring while the Goods are not in the actual custody of the Carrier.

---

*in the United States: An Average Adjuster's Viewpoint*, pp. 329-54 (3d ed. 1991) (Leland Dec. Exh. 16, noting that salvage expenses "become general average").  The Second Circuit has likewise specifically ruled that salvage is an expense of a General Average nature. *Amerada Hess Oil & Chemical Div. v. S/T Mobil Apex*, 602 F.2d 1095, 1099 (1979) (construing the York-Antwerp Rules) (salvage expenses are to be apportioned as general average).

Furthermore, both the General Average Guarantee which XL signed for the Cargo at issue here and the General Average Bond which Intcomex signed for the same Cargo unambiguously include "salvage" as a part of the general average obligation being secured and guaranteed.  Leland Dec. ¶¶14-15 and Exh. 14 and 15.

[15] If anything, Plaintiff should be defending Shipco, rather than be suing Shipco, in these proceedings, and Plaintiff reserves the right to demand its costs and attorney fees, due it under the Shipco Bill of Lading contract, in responding to Plaintiff's complaint.

[16] The definitions section of the Shipco Bill of Lading Terms define "Carrier" as being "…the Company stated on the front of this Bill of Lading as being the Carrier and on whose behalf this Bill of Lading has been signed."  Danes Dec., Exh. B, p. 1.  Accordingly, references to the "Carrier" in Shipco's bill of lading terms is a reference solely to Shipco. *Id.,* at Exh. A (Shipco is company on front of bill of lading). Per the Shipco Bill of Lading definitions, carriers who actually perform the transportation contract (such as the owner of the Vessel) are "Participating Carriers."  *Id.*, at Exh. B, p. 1-2.

Danes Dec. Exh. B, p. M&B Doc. 014, Clause 7. This clause explicitly provides as a contract term that Shipco is not liable for "any loss," no matter how caused, which occurred while the goods were in the custody of the Vessel and/or the Vessel Owner, and not in the custody of Shipco. *Id* This wide language clearly includes salvage charges incurred by Plaintiff as a result of a fortuity occurring when the cargo is not in the actual custody of Shipco, resulting from acts by others over whom Shipco has no control.[17] There is no issue of fact here – Shipco had absolutely no custody or control over the Cargo, or for that matter over the Vessel, when the Cargo was aboard the M/V AS Fortuna. Danes Dec. ¶3 and ¶¶10-11.

Shipco's Bill of Lading Terms also include even more specific language which unambiguously and specifically allocate the obligation to pay for salvage upon Plaintiff, not Shipco. Specifically, the contract provides very clearly that if a fortuity occurs during a voyage (such as the alleged grounding here), Shipco has no further responsibility, and it is solely the "Merchant"[18] – i.e. the Plaintiff, who is responsible for the additional costs incurred by such an event. The applicable contract provision states:

13) MATTERS AFFECTING PERFORMANCE

1. If at any time the Carriage is or is likely to be affected by any hindrance, risk, delay, difficulty or disadvantage of any kind (including the condition of the Goods) whensoever and howsoever arising (whether or not the Carriage has commenced) the Carrier may:

A. without notice to the Merchant abandon the Carriage of the Goods and where reasonably possible place the Goods or any part of them at the Merchant's disposal

---

[17] While such an exoneration clause might be unenforceable in the context of a COGSA claim, Point VII of this Memorandum makes clear that Plaintiff has not pled a COGSA claim here, and since there is no cargo damage, no COGSA claim exists and thus COGSA does not apply to this claim in any event. Accordingly, there is no legal basis for the Court to not enforce this clause as written.

[18] The definitions section of the bill of lading terms define "Merchant" as including "the shipper, the consignee, the receiver of the Goods, the holder of this Bill of Lading, any person having a present or future interest in the Goods or any person acting on behalf of any of the above mentioned persons." Danes Dec., Exh. B, p. 1. Accordingly, the Plaintiff Intcomex, and the Plaintiff's insurer XL, are included in the term "Merchant."

at any place which the Carrier may deem safe and convenient, whereupon the responsibility of the Carrier in respect of such Goods shall cease;

B. without prejudice to the Carrier's right subsequently to abandon the Carriage under A above, continue the Carriage.

In any event the Carrier shall be entitled to full Charges on Goods received for Carriage and the Merchant shall pay any additional costs resulting from the above mentioned circumstances.

Danes Dec. Exh. B, p. M&B Doc. 019, Clause 13. Thus, according to the clear language of the contract, it is Plaintiff, and not Shipco, who is responsible for any "additional costs" (which would certainly include salvage) that were incurred as a result of the alleged grounding. *Id*.[19]

Accordingly, Plaintiff has absolutely no contractual basis to demand that Shipco pay its salvage costs, and in fact it is clear that under multiple clauses in the Shipco Bill of Lading it is Plaintiff's contractual obligation to pay for Salvage, which is an expense that Shipco has no contractual responsibility for whatsoever.

## POINT III

### THERE IS NO BASIS TO HOLD SHIPCO LIABLE UNDER COMMON LAW MARITIME INDEMNITY, WHICH REQUIRES PLAINTIFF TO PROVE SHIPCO WAS AT FAULT, AS THERE IS NOT A SCINTILLA OF EVIDENCE HERE THAT SHIPCO HAD OR EVEN COULD HAVE HAD ANY FAULT

Shipco is equally entitled to dismissal here on summary judgment because there is no evidence that Shipco in booking a single container was even remotely at fault or otherwise

---

[19] Indeed, the contractual language is explicitly clear that not only is the Merchant, i.e. Plaintiff, responsible for General Average (which again per the incorporated York-Antwerp Rules includes salvage), but Shipco also in fact has a lien on Plaintiff's cargo to secure Plaintiff's obligation:

The Carrier shall have a lien for General Average contribution…The Carrier has the right to sell the Goods at public or private sale without notice to the Merchant to satisfy the lien in whole or in part. If the proceeds of this sale fail to cover the whole amount due, the Carrier is entitled to recover the deficit from the Merchant.

Danes Dec. Exh. B, p. M&B Doc. 022, Clause 20.

liable to indemnify the shipper for the alleged grounding, and thus no genuine issue of material fact exists for trial. The most recent case reviewing NVOCC liability in fact makes it absolutely clear that there is no basis for a singlular NVOCC to be found at fault for conditions aboard a vessel at sea:

> By definition, NVOCCs are non-vessel-operating intermediaries, and do not have physical control over specific vessels. NVOCCs, which do not operate vessels, are not likely to have the right or practical ability to inspect ships for seaworthiness or order repairs.

*Starr Indemnity*, 2018 WL 4002541, at *4. Indeed, the *Starr Indemnity* case made clear that NVOCCs have no duty to cargo to provide a seaworthy vessel, because holding NVOCCs to a duty of seaworthiness is tantamount to an impossible duty which cannot be legally imposed. *Id*. This entirely forecloses any liability of Shipco to Plaintiff under common law or tort indemnity, because it is settled, black letter law that a Plaintiff must show the defendant to be at fault in order to recover under a maritime tort indemnity cause of action. *See*, Schoenbaum, Admiralty & Mar. Law § 5:16 (6th ed.) (maritime tort indemnity requires fault). Schoenbaum is very clear on this:

> Tort indemnity is therefore limited to cases where a non-negligent or vicariously liable tortfeasor is entitled to indemnity from a person who is guilty of actual fault.

*Id.* (citing numerous cases) (emphasis supplied). Plaintiff's Amended Verified Complaint pleads no facts showing that Shipco is "guilty of actual fault" for causing the alleged grounding of the M/V AS Fortuna, D.E. 22, and it would be preposterous to suggest that an NVOCC, with one container on board and no control over the Vessel, could possibly be "guilty of actual fault" for causing a grounding of a cargo vessel thousands of miles away. Indeed, the complaint does not plead any facts whatsoever as to how Shipco (or any of the other NVOCC defendants) could have any such fault, and accordingly fails under the pleading standards of *Ashcroft*, 556 U.S. at 678.

To compound this, when Shipco requested Plaintiff to produce documents

supporting the allegation that Shipco was at fault, so as to determine if there is (regardless of the legally deficient pleadings), any actual facts to support the allegation that Shipco had fault here, **Plaintiff could not produce a single document** which provides even a scintilla of evidence that Shipco had any fault. Leland Dec. Exh. 4, (Plaintiff's answer to Shipco's Request for Production No. 6, p. 6) (Plaintiff failed to produce any documents substantiating the allegation). Plaintiff has also failed to identify any witnesses to support any fault on the part of Shipco with respect to the alleged grounding, and in fact Plaintiff has not identified even one witness to support any of its allegations. Leland Dec. Exh. 5 (Plaintiff's Initial Disclosures, disclosing no witnesses whatsoever). Below is the only "witness" identified on behalf of Plaintiff Intcomex:

> 3. Corporate Representative of Plaintiff Intcomex Peru SAC
> <u>Subjects of information</u>: cost incurred for salvage of cargo, shipment of cargo

*Id*. at p. 1. Plaintiff has thus provided no witness whatsoever to testify as to any facts pertaining to any alleged fault of Shipco; all that is provided in the disclosure are blank spaces for as of yet unidentified damages witnesses. *Id.* As of March 4, 2021, fact discovery in this case closes, without any document evidence or fact witnesses on unseaworthiness being produced. D.E. 39, p.2 (scheduling order).

Accordingly, there is no genuine issue of material fact here – Shipco clearly had no control over the vessel, its maintenance, crew or its navigation, had no access to the documents pertaining to such items, and in fact cannot even determine which vessel a cargo will in fact be loaded aboard, and thus has no actual fault whatsoever in causing the alleged grounding that is the basis for this action. Danes Dec. ¶3, 7-8 and 10-11; Seaboard Dec. ¶¶ 7-10. The Amended Verified Complaint therefore does not state a claim against Shipco (or any other NVOCC) under common law or tort maritime indemnity, and such allegations, to the extent they can be found in the Amended Verified Complaint, should accordingly be dismissed on summary judgment.

**PLAINTIFF'S ALLEGATION THAT THE IMDG
CODE WAS VIOLATED HAS NO BASIS WHATSOEVER IN
FACT AND SHOULD BE DISMISSED ON SUMMARY JUDGMENT**

Paragraph 41 of Plaintiff's Amended Verified Complaint inexplicably alleges that Defendants (including Shipco) "failed to discharge their duties and responsibilities in accordance with…the International Maritime Dangerous Goods ("IMDG") Code." D.E. 22, p. 9. Paragraph 42 of Plaintiff's Amended Verified Complaint alleges that the grounding was "directly and proximately caused by the Defendants' breach of the standard of care under…the IMDG Code." *Id*.

These allegations are most odd, and absolutely fail under the pleading standards of *Ashcroft*, 556 U.S. at 678. The IMDG Code is an international code governing the stowage and segregation of dangerous goods cargoes, so that cargoes will not react with each other or cause fires or explosions or chemical releases and pollution.[20] In Point VII, it is made absolutely clear that there is no cargo damage here. This case involves a routine engine breakdown. There is no allegation in the Amended Verified Complaint that any cargo reacted, caused a fire or an explosion, or was released into the environment. D.E. 22. There is in fact no allegation or evidence that any cargo being complained of here (with respect to Shipco, the cargo was routine computer parts), in any way qualified as being dangerous, or was damaged, or damaged any other cargo, in any way, shape or form. D.E. 22 (Amended Verified Complaint); Danes Dec. Exh. A (cargo identified as "Computer Parts, Accessories, Printers"). There is no allegation or evidence that the cause of the alleged engine breakdown and grounding of the Vessel could in any way be attributed to any cargo

---

[20] For details concerning the role of the IMDG Code, where it actually applies, in a maritime incident where cargo aboard actually caused a vessel casualty, *see In Re M/V MSC Flaminia*, 339 F.Supp. 3d 185, 198-99 (S.D.N.Y. 2018).

aboard, much less dangerous cargo subject to the IMDG Code, much less an actual violation of the IMDG Code, by Shipco or any of the Defendants, or anyone else having cargo aboard the Vessel. *Id*.

The inclusion of the IMDG Code in the pleadings appears to be shockingly gratuitous and lacking even a scintilla of factual support. Accordingly, there is no evidence of, and thus no genuine issue of material fact that Shipco in any way violated the IMDG Code, and accordingly these allegations against Shipco should be dismissed.

## POINT V

### THERE IS NO OTHER LEGALLY COGNIZABLE BASIS TO HOLD SHIPCO, AS AN NVOCC, LIABLE TO REIMBURSE ANY SALVAGE PAYMENTS ARISING OUT OF ANY ALLEGEDLY UNSEAWORTHY CONDITION OF THE VESSEL AS FORTUNA

Plaintiffs' Complaint alleges that the alleged grounding of the Vessel was caused by an unseaworthy condition of the vessel, and on that basis Plaintiff presumes Shipco (who, again, merely booked a single container) to be responsible for the alleged faults of the Vessel Owner, and hence liable to Plaintiff for the payment it allegedly made to the salvor for recovering the cargo. D.E. 22, ¶17. 24, 27, 32-33, and 40-42. Assuming, purely hypothetically, that the grounding was caused by some fault or shortcoming on the part of the Vessel, or some failure on the part of the Vessel Owner to make the Vessel unseaworthy, Plaintiff's Amended Verified Complaint still does not state a claim against Shipco for any salvage or other damages, because Shipco, as a NVOCC with no ownership or control over the Vessel, has no legal duty to Plaintiff to make the vessel seaworthy in the first place.

Case law has made it clear that claims to reimburse expenses arising out of a vessel casualty (such as salvage, the only damage alleged in the Amended Complaint), which historically

were made only against vessel owners[21], and are premised solely upon allegations that the vessel was unseaworthy, have no merit when asserted against a NVOCC, a paper carrier, who has no information or control over the vessel, and no control over its maintenance, crewing or operation:

> It is true that as a "carrier," NVOCCs would seemingly be held to all responsibilities and liabilities applied to "carriers" under COGSA, a law initially passed in 1936, including the duty to exercise due diligence to make a ship seaworthy. However, it is not clear to this Court that this result was intended or warranted. By definition, NVOCCs are non-vessel-operating intermediaries, and do not have physical control over specific vessels. NVOCCs, which do not operate vessels, are not likely to have the right or practical ability to inspect ships for seaworthiness or order repairs. It strikes this Court as unrealistic to hold NVOCCs to impossible duties. Indeed, a recent law review article observed that "[n]o American case has expressly held that an NVOCC has a duty to exercise due diligence to make a ship seaworthy." Andrew D. Kehagiaras, Duty Call: Do Nvoccs Have A Duty to Exercise Due Diligence to Make A Ship Seaworthy?, 27 U.S.F. Mar. L.J. 37, 63 (2015).

*Starr Indemnity*, 2018 WL 4002541, at *4. And an NVOCC cannot be legally liable for any damage to a vessel or its cargo other than for cargo damage claims by the actual shipper for whom it is moving cargo. *See, e.g., Yang Ming Marine Transp. Corp. v. Oceanbridge Shipping Int'l, Inc.*, 48 F. Supp. 2d 1049, 1057-58 (C.D. Cal. 1999); *Int'l Fire & Marine Ins. Co. v. Silver Star Shipping Am., Inc.*, 951 F. Supp. 913, 915 (C.D. Cal. 1997) ("An NVOCC is a carrier in relation to the shipper, although it is a shipper in relation to the vessel."). *See also* Andrew D. Kehagiaras, *Duty Call: Do Nvoccs Have A Duty to Exercise Due Diligence to Make A Ship Seaworthy?*, 27 U.S.F. Mar. L.J. 37, 63 (2015)[22] (Noting that there is no case authority anywhere in the United States for the proposition that a non-vessel operating common carrier has any duty of due diligence to make a vessel, which it does not operate, seaworthy). While Plaintiff certainly could have a claim against

---

[21] *See* Buglass, *Marine Insurance and General Average in the United States*, p. 337 (3d Ed. 1991). excerpt appended as Leland Dec. Exh. 16 (noting that in the American marine insurance market indemnification of salvage payments is a right reserved against "the vessel owner and/or concerned P and I Club"). The same treatise states that it is just the "Shipowner [that] may sue the owner of cargo for general average contribution." *Id.* at 302.

[22] Copy appended as Exh. 19 to the Leland Declaration.

the Vessel Owner, who is a named defendant here, as pertains to the seaworthiness of the Vessel[23] the seaworthiness of the Vessel is entirely irrelevant to Plaintiff's claim against Shipco (and the other NVOCCs) who are defendants in this action.

It is in fact common knowledge in the marine industry, and has been specifically recognized by the Second Circuit, that NVOCCs such as Shipco are intermediaries who have absolutely no involvement with or influence upon the operation, maintenance or management of the vessels which ultimately carry the cargo. The Second Circuit has very specifically described the limited nature of a NVOCC's limited role as a shipper, with respect to the carrying vessel:

> NVOCCs operate as middlemen; they arrange for relatively small shipments to be picked up from shippers, consolidate the smaller parcels, and ship them via a carrier or several carriers. They do not, however, own or charter the ships that actually carry the cargo.
>
> * * *
>
> With respect to the vessel and her owner, however, the NVOCC is an agent of the shipper, and thus merely a customer—indeed, only one customer among hundreds on any given voyage.

*Ins. Co. of N. Am. v. S/S Am. Argosy*, 732 F.2d 299, 301 (2d Cir. 1984).

The limited role of the NVOCCs in this particular case is entirely in accord with the Second Circuit's description of them in the *S/S Am. Argosy* case. Shipco, as a shipper with respect to Seaboard, had no control over the vessel or any aspect of the vessel's maintenance, crewing, or navigation, and no access to the documents of the Vessel which would pertain to these items. Danes Dec. ¶3, 7-8 and 10-11; Seaboard Dec. ¶¶ 7-10.[24] Accordingly, the facts that the

---

[23] Plaintiff has not in fact produced even one shred of evidence in discovery to support its bare and conclusory allegation in the Amended Verified Complaint that the Vessel was unseaworthy at all. Even Plaintiff's Amended Verified Complaint provides nothing but a "formulaic recitation" and "conclusion" that the Vessel was unseaworthy, without alleging any actual facts, precisely the type of pleading deficiency which compels dismissal under Rule 12 under the standard of the Supreme Court's *Bell Atlantic Corp.* and *Ashcroft* decisions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556).

[24] Indeed, as already noted, when Shipco issued its bill of lading to Intcomex, Shipco believed that the vessel to be carrying the cargo was the M/V AS Faustina 16. Danes Dec. ¶¶6-7. When Shipco booked the cargo

Second Circuit recognized with respect to the NVOCC in the *S/S Am. Argosy* case are essentially identical to the facts at bar herein with respect to the NVOCC Shipco in this case.

Since Shipco, as a NVOCC, had no control over the M/V AS Fortuna whatsoever, per the *SS Am. Argosy* precedent, there is no basis for this court to hold Shipco liable for any alleged unseaworthy condition of the vessel, even if unseaworthiness were somehow proven.[25]

---

with Seaboard, Seaboard substituted the M/V AS Fortuna for the M/V AS Faustina 16, as it was entitled to do under the Liberties clause in its bill of lading. Danes Dec. ¶¶7-8; Seaboard Dec. ¶4, authenticating attached Seaboard Bill of Lading Terms, including "Liberties Clause" on p. 9-10 of attached terms. Seaboard itself, having merely chartered space aboard the Vessel, had no control over the vessel or any aspect of the vessel's maintenance, crewing, or navigation, and no access to the documents of the Vessel which would pertain to these items. Seaboard Dec. ¶6.

[25] Though COGSA does not apply here, and in fact has not even been pled, it is significant to note that even if it somehow did, under these same facts, the so-called "Q Clause" defense under COGSA completely exonerates Shipco, as Shipco has no fault whatsoever for causing any alleged grounding of a vessel it had no control over. This clause provides that:

> Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from –
>
> ***
>
> (q) any other cause arising without the actual fault or privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

49 Stat. 1207, 1210 (1936); formerly codified as 46 U.S.C. App. § 1304, and is presently located in a note to 46 U.S.C. § 30701. There clearly are no facts substantiating that Shipco could possibly have any fault for what happened aboard the Vessel in the time period leading up to the alleged grounding. *See*, Schoenbaum, Admiralty & Mar. Law § 10:33 (6th Ed.) (reviewing the Q Clause defense in depth). It is thus settled law that a carrier will not be held responsible for damage caused by a factor over which the carrier has no control. For instance, it has been uniformly found that a carrier is not liable for the damage caused by stevedores which the carrier has no legal control over. *All Commodities Supplies, Ltd. v. M/V Acritas*, 1981 WL 6769684 (E.D. La. May 18, 1981), *aff'd sub nom*, 702 F.2d 1260, 1263 (5th Cir. 1983) (no carrier liability where carrier had no control over government required stevedores); *Oparaji v. Atl. Container Line*, No. 07 CIV 2124 (GEL), 2008 WL 4054412, at *9 (S.D.N.Y. Aug. 28, 2008), *aff'd*, 363 F. App'x 778, 779 (2d Cir. 2010) (same); *United States v. Hellenic Lines Ltd.*, 1981 WL 6769694 (S.D.N.Y. Nov. 20, 1981) (carrier not liable for cargo loss caused by Congo mandated stevedores over which it had no control); *Metalimport of Romania v. S. S. Italia*, 426 F. Supp. 770, 773 (S.D.N.Y. 1976) (same with respect to Romanian government stevedores).

## POINT VI

### THE VESSEL OWNER IS AN INDISPENSIBLE PARTY
### AND SINCE IT HAS NOT YET BEEN, AND CAN NOT BE,
### FULLY JOINED IN THIS ACTION, DISMISSAL IS REQUIRED

If the Court were to rule that Shipco could actually be legally responsible for damages here if the Vessel were to be found to be unseaworthy, then this would necessitate a ruling by the court as to whether the Vessel Owner is an "indispensable party" under Fed. R. Civ. P. 19, and whether this case can go forward without joining the Vessel Owner. Plaintiff submits that under the standards delineated in Rule 19 and cases interpreting it, the Vessel Owner would most certainly be indispensable, and must be joined in order for this case to proceed any further.

Fed. R. Civ. P. 19(a)(1) provides that a person (in this case, the Vessel Owner) must be joined if, in that person's absence, the court cannot accord complete relief among existing parties, or if that person's absence can "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." It is a matter of record that Plaintiff sued the Vessel Owner in the Amended Verified Complaint, but there is no record on the docket of any service being affected on the Vessel Owner, and the 90 day deadline to serve the Vessel Owner under Fed. R. Civ. P. Rule 4(m) has since lapsed, as the deadline to effect service lapsed 90 days after filing their Amended Verified Complaint on August 10, 2020 (D.E. 22), i.e. on November 9, 2020.[26] It is thus clear that the Vessel Owner has not been joined. Likewise, it is

---

[26] Shipco's undersigned counsel has been independently advised by the Vessel Owner's attorney that it will not be appearing in this action, on the basis that this Court has no jurisdiction over the Vessel Owner, who is a company in the Netherlands with no connection to New York. Leland Dec. ¶12. Plaintiffs pled that the vessel owner "regularly does business in New York." (D.E. 22, p. 3, ¶8). Even if true, this is not sufficient to establish general jurisdiction over the vessel owner under the holding of *Daimler AG v. Bauman*, 571 U.S. 117, 137-140 (2014) (requiring the defendant be either incorporated or headquartered within the territorial jurisdiction of the Court). The pleadings indicate that this specific dispute has no connection with New York but rather involves a voyage between Miami, Florida and Callau, Peru (D.E. 22, p. 12-14; Schedule A, B, and C). It would therefore seem the case that the vessel owner is in fact outside this Court's personal jurisdiction and has not been and cannot be properly served and joined.

a matter of record that Shipco has filed a crossclaim against the Vessel Owner, seeking indemnity for any potential liability here (D.E. 28, p. 9-12).  Shipco would clearly be entitled to indemnity from the Vessel Owner were this Court to rule that Shipco has liability for an unseaworthy vessel over which it has no control, and for which an absent Vessel Owner, not joined in this action, is solely responsible.

Fed. R. Civ. P. 19(b) provides that the Court must evaluate the case to determine if it should proceed, or be dismissed, if a party that is required to be joined cannot be joined to the action.  It provides a list of factors, which (among others) the Court should weigh under a discretion standard:

> Federal Rule of Civil Procedure 19(b) enumerates four factors to be evaluated by the court once it has determined that the joinder of a person or persons described in Rule 19(a) is desirable but not feasible. The list in subdivision (b) does not exhaust the possible considerations the court may take into account; it simply identifies those that will be most significant in most cases. Moreover, the rule does not state what weight is to be given to each factor. This must be determined by the court in terms of the facts of a given case and in light of the governing equity-and-good-conscience test. Thus, to a substantial degree the effective operation of the rule depends on the careful exercise of discretion by the district court.

Wright & Miller, Fed. Prac. & Proc. Civ. § 1608 (3d ed.).

The most significant factor listed in Fed. R. Civ. P. 19(b) is prejudice under Rule 19(b)(1).  Points III and V of this memorandum makes clear the substantial prejudice to Shipco of not having the Vessel Owner joined in the litigation to contest Plaintiff's claim of unseaworthiness. Again, there is no disputing that Shipco had absolutely no control over how the vessel was maintained, operated, staffed and navigated, and in fact Shipco has no way of even knowing what happened aboard the Vessel.  Danes Dec. ¶ 3 and 10-11.  Shipco has no access to documents which pertain to the internal management, maintenance and navigation of the Vessel and no access to the pertinent people aboard or ashore who the Vessel Owner hired to navigate, maintain, and otherwise

operate the Vessel prior to and during the voyage in question. *Id*. at ¶10-11. The only party who can speak to the particulars of the vessel, is the Vessel Owner itself who actually managed, maintained and navigated the vessel, and hence would know what was done, what was not done, and would have sole and exclusive access to the evidence to understand and substantiate these facts.

If Shipco's liability is to be legally intertwined, and in fact directly coupled, with the actions of a Vessel Owner, over whom Shipco has no control whatsoever, then there is substantial prejudice to Shipco, were this case to proceed without joining the Vessel Owner.

The Second Circuit has made clear that an absent party is indispensable if its interests are "inextricably intertwined" with a defendant before the Court, and failure to join the absent party means the case cannot go forward and must be dismissed. *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 73-74 (2d Cir. 1984) (dismissing claim on basis that case cannot proceed in the absence of one company when "the interests of the two companies were 'inextricably intertwined' throughout the period in question."). Ample case law from other circuits make it absolutely clear that when a defendant is being held liable for work performed by another company, that other company is an indispensable party, and must be joined in order for the case to proceed. For instance, in the *Chadwick* case, the Court ruled that a foreign subcontractor is indispensable when a domestic company was being sued on the basis of the foreign subcontractor's actions. *Chadwick v. Arabian American Oil Company*, 656 F. Supp. 857, 862-63 (D.Del. 1987) (independent contractor providing medical care in Saudi Arabian facility is an indispensable party in action against company employing the contractor). Likewise, in the *in re Toyota Motor Corp.* case, the court ruled that when a foreign corporation's acts are being imputed to the company that hired it, that foreign corporation is an indispensable party and must be joined in a case against the

defendant premised upon those acts committed by the absent party. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 826 F. Supp. 2d 1180, 1190 and 1196-98 (C.D. Cal. 2011) (foreign company who made advertisements for Toyota held to be an indispensable party in action against Toyota for "false and misleading advertising" and "deceptive marketing").

Likewise, in what is a very similar case to this one, except that it involves an airplane crash instead of a vessel grounding, it was held that litigation could not proceed against an airplane manufacturer without first joining the company that owned and maintained the airplane which crashed, which was found to be an indispensable party. *Whyham v. Piper Aircraft Corporation*, 96 F.R.D. 557, 559-64 (M.D. Penn. 1982). In *Whyham*, the Court extensively analyzed the particulars of Rule 19, and found substantial prejudice to the defendant aircraft manufacturer if it were to allow the case to proceed without joining as a defendant the company that owned and maintained the aircraft – who potentially had their own fault for causing the crash at issue. *Id*. at 562. The *Whyham* case took substantial notice of the Supreme Court case *Piper Aircraft Co. v. Reyno*, which ruled that there would be clear prejudice against an aircraft manufacturer were a litigation to go forward without the presence of additional defendants. *Id*., citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 259 (1981). The Court in *Whyham* noted that while the Supreme Court based its dismissal of that earlier case against Piper Aircraft on *forum non conveniens*, nevertheless the finding of clear prejudice would have likewise compelled a dismissal under Fed. R. Civ. P. 19. *Id*.

The *Whyham* case is precisely on point here – in fact the case for indispensability is even stronger for Shipco in this case, than for Piper Aircraft in *Whyham*. In *Whyham*, at least the defendant aircraft designer/manufacturer being sued had thorough knowledge of the airplane,

having designed and built it, and merely sought joinder of the company that owned and maintained it after it was sold and put into operational service. *Id*. at 558. Shipco, in distinct contrast, has never had any involvement with the Vessel, and has absolutely no knowledge of or access to the technical details of the vessel itself, let alone how it was operated, maintained and navigated by the Vessel Owner's management and employees, prior to and during the voyage in question. Danes Dec. ¶¶ 10-11.

Fed R. Civ. P. 19(b)(2) states that the Court should consider whether prejudice could be lessened or avoided by protective provisions in the judgment, shaping of the relief or other measures. Shipco respectfully submits that the prejudice here is glaring and cannot be lessened or avoided in any way. Only the Vessel Owner knows what occurred on that vessel, and to put a company with no knowledge whatsoever as to the Vessel itself, to the burden of trying to prove an absent Vessel Owner's due diligence to make a vessel unseaworthy, is prejudice which cannot be remedied by "protective provisions in the judgment" or by "shaping relief" or "other measures" which Rule 19(b)(2) suggest might be done. It would be a profound injustice to allow Plaintiff to proceed with this case, as if Plaintiff proves unseaworthiness of the vessel it would be virtually by default, with the only party knowledgeable about the vessel not joined in the action.

Certainly, if Shipco is to face any liability contingent on the seaworthiness of a vessel it does not control and does not have access to, the owner of that vessel is indispensable, and must be joined before this case is allowed to proceed any further.

## POINT VII

## THERE IS NO VALID CLAIM AGAINST
## DEFENDANT SHIPCO UNDER U.S. COGSA

In order to establish a prima facie case under the Carriage of Goods By Sea Act ("COGSA")[27], Plaintiff must allege (and prove) delivery of the Cargo to the carrier in good condition, and receipt in damaged condition. *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 98 (2d Cir. 1998).

The Amended Verified Complaint does not allege any damage to the Cargo at issue. D.E. 22. In fact, Plaintiff's attorney has confirmed in response to an interrogatory that regardless of what is in the pleadings, the cargo was not physically damaged at all, stating specifically that:

> The insurer of the subject cargo is XL Catlin Services SE who paid $30,772.91 in salvage costs with respect to this cargo. Plaintiffs are asserting a salvage indemnity claim (not physical damage or General Average) with respect to the subject cargo.

Leland Dec. Exh. 1, p. 3-4 (Plaintiff's response to Shipco's Interrogatory No. 2). Moreover, the Amended Verified Complaint does not even plead a COGSA claim or mention COGSA. D.E. 22. Accordingly, the Amended Verified Complaint does not state a claim under COGSA, and COGSA thus does not govern with respect to Plaintiff's claim against Shipco. Furthermore, with respect to a claim against an NVOCC, it has been specifically held that where there is no physical damage to cargo, COGSA simply does not apply. *Starr Indemnity*, 2018 WL 4002541, at *5. The fact is that COGSA only concerns claims pertaining to cargo damage, and has no application to claims which do not involve actual damage to cargo, has been settled law in this circuit since 1972, when the Second Circuit decided the case *Hellenic Lines, Ltd. v. Embassy of Pakistan*, 467 F.2d 1150, 1156 (2d Cir. 1972). In *Hellenic Lines*, the Second Circuit, entirely ruled out COGSA from

---

[27] Enacted as 49 Stat. 1207 (1936); formerly codified as 46 U.S.C. App. § 1304, and is presently located in a note to 46 U.S.C. § 30701.

applying at all in the case of claims for mere delay damages where cargo was not damaged. *Id.* The Second Circuit specifically, and unambiguously, ruled that:

> The Embassy, however, has misconstrued the scope of COGSA. This act applies to the carriage of goods. The provision "loss or damage" in § 1304(3) refers to physical loss or damage to the goods. Neither this section nor any other section of COGSA was intended to limit claims for delays in discharging cargo. Detention is wholly unconnected with physical loss or damage to goods and is a matter which COGSA left to be dealt with by contract between the parties.

*Id.* In both the *Starr Indemnity* case, and the *Hellenic Lines* case, the Court was very clear that where there is no cargo damage, there is no COGSA claim, and the only basis at all for any recovery by the Plaintiff for recovery of expenses in the absence of cargo damage is the terms and conditions of the applicable contract, and not under the standard and burdens established by COGSA.[28] *Id.*; *Starr Indemnity,* 2018 WL 4002541, at *5; *Bubble Up Int'l Ltd.,* 458 F. Supp. At 1104, Fn. 4 (COGSA "does not apply to actions to recover salvage or General Average deposits").

Further, the economic loss doctrine precludes any claims of negligence against the NVOCCs. There is no claim in maritime tort for economic damages without actual physical injury. The *Robins Dry Dock* Rule "effectively bars recovery for economic losses caused by an unintentional maritime tort absent physical damage to property in which the victim has a proprietary interest." *Am. Petroleum & Transp., Inc. v. City of New York,* 902 F. Supp. 2d 466, 469 (S.D.N.Y. Oct 10, 2012), *aff'd,* 737 F.3d 185, 195-96 (2d Cir. 2013) (*quoting G & G Steel, Inc. v. Sea Wolf Marine Transp.,* LLC, 380 Fed. Appx. 103, 104 (2d Cir. 2010) (summary order)); *see generally Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 308-09 (1927). Claims seeking recovery for General Average and salvage, absent physical damage, are barred as claims of

---

[28] Point II of this Brief demonstrates that the applicable contract terms place the burden of paying salvage squarely upon Plaintiff, and that the contract terms in fact entirely rule out any responsibility for Shipco to pay it.

negligence under the economic loss doctrine.

Accordingly, to the extent that Plaintiff's complaint could be in any way construed to assert a COGSA claim,[29] such a claim should be dismissed as there is no genuine issue of material fact here – plaintiff has not pled cargo damage, has admitted there is no cargo damage, and therefore has provided no evidence supporting any claim against Shipco under COGSA.

## POINT VIII

### UNDER THE SHIPCO BILL OF LADING TERMS AND CONDITIONS, SHIPCO IS ALSO ENTITLED TO BENEFIT FROM THE INJUNCTION ISSUED IN THE VESSEL OWNER'S LIMITATION OF LIABILITY PROCEEDINGS, WHICH IN TURN DIRECTLY BAR THIS COMPLAINT

The Plaintiff's contract with Shipco additionally extends to Shipco all of the legal defenses which are available to the Vessel Owner. Specifically, Paragraph 6.3 of the Shipco Bill of Lading Terms contractually extend to Shipco as a defense to liability "any law, statute of regulation available to the Owner of the vessel on which the Goods are carried." Danes Dec. Exh. B, p. M&B Doc. 014. Additionally, Paragraph 7.2.A of the Shipco Bill of Lading Terms provides that Shipco is contractually entitled, as a defense to liability, to "all defenses available to the participating carrier(s) by law." *Id*. at p. M&B Doc 15. The Vessel Owner is included in the definition of "Participating Carrier" in the Shipco Bill of Lading Terms. *Id*. at p. M&B Doc. 012-13.

Accordingly, Shipco has contractual defenses to the liability that Plaintiff is alleging here, which come into effect, *inter alia*, when the Vessel Owner establishes a legal limit to its own liability under applicable law, and in fact the Vessel Owner has done precisely that.

---

[29] Plaintiff's Amended Verified Complaint is so vague as to what it is alleging with respect to Shipco and the other NVOCC defendants, that Shipco has drafted this motion to identify (and exclude) every possible allegation the complaint might be construed to assert. The Amended Verified Complaint would likely not meet the pleading standards established in *Ashcroft*, 556 U.S. at 678 (2009).

Specifically, it has been admitted by Plaintiff,[30] and is clearly established by the Declaration of Joseph Tan, a leading solicitor who specializes in maritime law in Singapore, submitted in support of this motion, that the Vessel Owner in fact filed for what is known in maritime law as "Limitation of Liability" in connection with this casualty in the High Court of the Republic of Singapore (hereinafter "Singapore Limitation Proceeding"), and successfully limited its liability under Singapore law. Tan Dec. ¶¶ 2-9 and 10-15. Shipco's Bill of Lading Terms, cited above, unambiguously extend the benefit of the Vessel Owner's legal defenses to Shipco, and thus the effect of that Injunction is to also bar Plaintiff from any recovery against Shipco beyond the owner's limitation fund established in Singapore, which for all claimants has been set at 2,782,554 Special Drawing Rights (SDRs). Tan Dec. Exh. C, p. 2.[31]

Shipco in summary is fully entitled here to enforce the contractual terms in the

---

[30] Mr. Tan's Declaration is in fact not really in dispute here, as Plaintiff has in fact admitted in response to Shipco's Requests for Admission that a) the Singapore Limitation Proceeding pertaining to the Vessel exists (Leland Dec. Exh. 2, RFA Answer No. 2), b) that none of the claimants in the Singapore Limitation Proceeding contested the right of the Vessel Owner to limit its liability for the grounding in that proceeding (RFA Answer No. 4), c) that the Vessel Owner has in fact been granted limitation of liability by the Court in Singapore (RFA Answer No. 5), and that Plaintiff could have filed a claim for the Cargo at issue here in the Singapore Limitation Proceeding, but elected not to do so (Leland Dec. Exh. 3, RFA Answer Nos. 38 and 39).

[31] In addition to limiting the Vessel Owner's liability, the High Court of the Republic of Singapore also issued an injunction (the "Injunction") against any suit against the Vessel Owner outside of the limitation proceedings constituted there, except to establish liability (hereinafter "Injunction"). Tan Dec. ¶7 and ¶¶10-13. Pursuant to this Injunction, which Plaintiff has also admitted is in effect (See Leland Dec. Exh. 2, RFA Answer No. 3), the Singapore Court has enjoined all suits against the Vessel Owner in any other court, other than a suit "for the limited purpose of establishing liability of a vessel owner for their claims." Tan Dec. ¶11. The Injunction bars any award of money damages against the Vessel Owner in other courts and requires that "once liability of the vessel owner is either admitted or adjudicated upon in another court, the assessment of the quantum of damages must be brought in the Singapore limitation action by way of a claim on reference." *Id*. Mr. Tan is quite clear, in summing up the limited scope of Plaintiff's ability to sue the Vessel Owner in courts outside of Singapore on this loss:

> Accordingly, those subject to the Injunction cannot obtain a judgment for damages against the vessel owner in other courts; rather the Injunction requires them to file a claim in the Singapore Limitation Proceeding."

*Id*. Since the "Wherefore" clause of the Amended Verified Complaint filed in this action requests that this Court issue a money judgment against the Vessel Owner (D.E. 22, p. 10-11), Plaintiff is directly violating the Injunction by suing the Vessel Owner in this action.

Shipco Bill of Lading which are triggered by the Vessel Owner's securing of limitation of liability and its protective Injunction in Singapore. In particular, under Clauses 6.3 and 7.2.A of the Shipco Bill of Lading, cited above, Shipco is contractually entitled to claim the benefit of the legal defenses that the Vessel Owner has in fact secured, in Singapore, and thus Plaintiff is contractually barred from obtaining a money judgment against Shipco here, the contract thus effectively now requires Plaintiff to go to Singapore and claim against the vessel owner's limitation fund there. *Id*. Tan Dec. ¶¶2-9 and 10-15.

Plaintiff is thus contractually barred from pursuing Shipco for a judgment in this Court,[32] and accordingly Shipco is additionally entitled to summary judgment dismissal on this basis.

## POINT IX

### IN ANY EVENT, SHIPCO'S MAXIMUM LIABILTY IS LIMITED BY CONTRACTUAL AGREEMENT TO $500

Finally, in the unlikely event that the court finds any basis upon which Shipco might be held liable to Plaintiff under any cause of action as alleged in the Amended Verified Complaint, Shipco's liability would in any event not exceed $500 in accordance with the terms of the Shipco Bill of Lading. The applicable clause is reproduced below:

> Where the Hague Rules (COGSA) or Hague-Visby Rules (COGWA) or any legislation making either Rules compulsorily applicable to this Bill of Lading, the Carrier shall not unless a declared value has been noted in accordance with (C) below, be or become liable for any loss or damage to or in connection with the Goods in an amount per package or shipping unit in excess of the package or shipping unit limitation as laid down by either of the Rules or legislation. Such limitation amount according to COGSA is US$500 and according to COGWA is

---

[32] Shipco additionally points out that if a judgment against the Vessel Owner cannot be fully pursued here by Plaintiff for its indemnity, as the Singapore Injunction would appear to establish, then the case for dismissal under Fed. R. Civ. P. 19 becomes even stronger. If an indispensable party is precluded from being fully brought in a lawsuit, by operation of law, then the litigation must be dismissed. *Republic of the Philippines v. Pimentel*, 553 U.S. 851, 865-873 (2008) (finding Republic of the Philippines an indispensable party, and as it could not be joined due to sovereign immunity, and no means of lessening the prejudice caused by its absence from the litigation could be identified, the case was dismissed).

666.67 units of account per package or units of account per kilogram of gross weight of the Goods lost or damaged, whichever is the higher. **If no limitation amount is applicable under either of the Rules or legislation the limitation shall be US$500.**

Danes Dec. Exh. B, p. M&B Doc 16, Clause 8(2) (emphasis supplied).

The language above thus provides that Shipco's liability for any damage of any kind shall not exceed $500 per package if COGSA applies, and if COGSA does not apply (as Point VII makes clear it does not), the contractual limit of liability is $500 in total. *Id.* Accordingly, Shipco's liability in this case, in the unlikely event there is any, is limited to $500 in total.[33]

## **CONCLUSION**

Plaintiff's motion should be granted and Shipco should be granted judgment on the pleadings, or be granted summary judgment in this action, and be dismissed with prejudice, or be granted dismissal pursuant to Rule 19. Alternatively, an order should be entered granting partial summary judgment, in favor of Shipco, limiting its liability to Plaintiff to $500.

Dated:  Rye, New York
           February 25, 2021

MALOOF & BROWNE LLC

By: ____/s/ David T. Maloof_____
       David T. Maloof, Esq.
       Kipp C. Leland, Esq.
411 Theodore Fremd Avenue - Suite 190
Rye, New York 10580
Tel: (914) 921-1200
Fax: (914) 921-1023
E-mails: dmaloof@maloofandbrowne.com
               kleland@maloofandbrowne.com

*Attorneys for Defendant*
*Shipco Transport, Inc.*

---

[33] Even if the Court were to find that Shipco's contractual limit of liability is $500 per package (instead of in total), the bill of lading is unambiguous that the Cargo consisted of 4 packages, or $2,000 in total.  Danes Dec. Exh. A (Shipco Bill of Lading) (see the "No. of Pkgs" column on the bill of lading).